**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| CC RECOVERY, INC., *et al.*, | * | |
| Plaintiffs | * | |
| v. | * | CIVIL NO.  JKB-12-3786 |
| CECIL COUNTY, MARYLAND, | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**<u>MEMORANDUM</u>**

*I.  Background*

This lawsuit was filed by CC Recovery, Incorporated, against the Board of
Commissioners of Cecil County, Maryland (the "County"), after the latter approved a zoning
ordinance change resulting in the denial of an occupancy permit for a commercial space that CC
Recovery had leased from Acorn Investment Company II, LLC ("Acorn"), and in which CC
Recovery intended to operate a methadone treatment clinic.  (Compl., ECF No. 1.)  After some
preliminary proceedings, CC Recovery and Acorn filed an amended complaint that added Acorn
as a plaintiff.  (Am. Compl., ECF No. 22.)  Pending before the Court is the County's motion for
partial dismissal under Federal Rule of Civil Procedure 12(b)(6), seeking to dismiss Acorn as a
plaintiff and to dismiss Count III.[1]  (Def.'s Mot. Dismiss, ECF No. 23.)  The motion has been
briefed (ECF Nos. 24 & 25), and no hearing is necessary, Local Rule 105.6 (D. Md. 2011).  The
motion will be granted in part and denied in part.

---

[1]  Although Defendant's motion cites only Rule 12(b)(6), its supporting memorandum also relies upon
Rule 12(b)(1) by contending that Acorn lacks standing to sue.  This opinion will address both rules and the standards
applicable to them.

## II.  Standard for Dismissal under Rule 12(b)(1)

The burden of proving subject-matter jurisdiction is on the plaintiff.  *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) (noting challenge may be either facial, *i.e.*, complaint fails to allege facts upon which subject-matter jurisdiction can be based, or factual, *i.e.*, jurisdictional allegations of complaint are not true).  *See also Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (same); *Richmond, Fredericksburg & Potomac Ry. Co.*, 945 F.2d 765, 768 (4th Cir. 1991) (same).  In the case of a factual challenge, it is permissible for a district court to "consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Richmond, Fredericksburg*, 945 F.2d at 768 (citing *Adams*, 697 F.2d at 1219).

## III.  Standard of Dismissal for Failure to State a Claim

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  An inference of a mere possibility of misconduct is not sufficient to support a plausible claim.  *Id.* at 679.  As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level."  550 U.S. at 555.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . .  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).  Although when considering a motion to dismiss a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations.  *Twombly*, 550 U.S. at 555.

## IV.  *Analysis*

Preliminarily, the Court observes that Defendant has not contested CC Recovery's standing to sue the County and has not sought dismissal of either Count I, which invokes the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, or Count II, which seeks redress under 42 U.S.C. § 1983 for constitutional violations.  In the latter count, Plaintiffs appear to make both equal protection and due process claims, although the equal protection claim is not explicitly stated as such.

### A.  *Standing*

Defendant asserts that Acorn lacks Article III standing under the U.S. Constitution. (Def.'s Mot. Dismiss Supp. Mem. 10.)  Additionally, Defendant argues that Acorn lacks standing under the ADA.  (*Id.* 5.)  The Court will first address whether Acorn presents the requisites for Article III standing.

#### 1.  *Article III Standing*

A plaintiff's standing to sue in federal court is "an integral component of the case or controversy requirement" of Article III.  *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006).  To have Article III standing, "[t]he plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The County's argument as to why Acorn does not have Article III standing is a little hard to follow.  The County notes that Acorn and CC Recovery executed the lease for the clinic space after they became aware of the proposed amendment to the zoning ordinance and, further, incorporated a contingency for Acorn to return CC Recovery's

advance of "fit-out" expenses, designed to cover the refitting of the interior to serve CC Recovery's needs, in the event the project was not approved.  (Def.'s Mot. Dismiss Supp. Mem. 11.)  Then, the County states:

> Because Acorn proceeded with the fit-out of the tenant space knowing that CCR might not be able to lease the space and pursuant to a contract that required Acorn to return the fit-out money to CCR if the project was not approved, this defeats Acorn's claim of an injury-in-fact suffered due to, and caused by, the County's actions.  While Acorn may be "injured" in a broad sense because it lost a potential tenant, it is not the requisite concrete, particularized injury-in-fact caused by the County to support Acorn's standing to sue the County under the circumstances.

(*Id.* (citation omitted).)

The County further states that the "tenuous nature" of the relationship between CC Recovery and Acorn demonstrates a "lack of causation" between the County's action—presumably, referring to amendment of the zoning ordinance and denial of the occupancy permit based on the amendment—and Acorn's loss of a tenant.  (*Id.* 11-12.)  To the extent the County may be resting its argument on an alleged absence of proximate cause, the argument has no merit.  The *Lexmark* Court stated clearly that "[p]roximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."  134 S. Ct. at 1391 n.6.  It is evident that Acorn's inability to rent to CC Recovery, as well as the consequential loss of rental income and unreimbursed fit-out expenses, is fairly traceable to the County's conduct.  And whether Acorn could foresee or not the County's making impermissible that which was permissible at the time the lease was signed does not nullify the actual economic loss suffered by Acorn because of the County's later action.  The complaint plainly alleges that Acorn has suffered the requisite concrete and particularized injury in fact to sustain Article III standing.  Moreover, Acorn's injury is redressable by a favorable

judicial decision awarding damages and providing injunctive relief.  Consequently, the Court concludes Acorn has Article III standing for this lawsuit.

### 2.  *"Standing" under the ADA*

The County's argument is framed in the parlance of "statutory standing," which was part of the accepted jurisprudence before the recent decision in *Lexmark*.  *See, e.g.*, *Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 97 (1998).  The inquiry as to whether a plaintiff's interests fall within the "zone of interests" for which a statutory cause of action exists was said to be "an issue of statutory standing."  *Id.* (emphasis omitted).  This determination was also referred to as one of the three "prudential limitations" on standing.  *Lexmark*, 134 S. Ct. at 1386.  The other two "prudential limitations" were "the general prohibition on a litigant's raising another person's legal rights[ ] [and] the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches."  *Id.* (citing *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004), in turn citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

The *Lexmark* opinion, however, changed the legal landscape by concluding that the "zone of interests" question is no more than a question of whether a plaintiff has stated a cause of action under a particular statute.  134 S. Ct. at 1387.[2]  Thus, whether a plaintiff's interests fall within the zone of interests protected by a statute is not a question under Rule 12(b)(1) of whether subject-matter jurisdiction exists but, instead, is a question under Rule 12(b)(6) of

---

[2]  The *Lexmark* Court also noted that the "generalized grievance" branch of the "prudential limitations" doctrine had already been determined by the Court to be simply a failure to present an Article III case or controversy.  134 S. Ct. 1387 n.3 (citing *inter alia Lance v. Coffman*, 549 U.S. 437, 439 (2007 (*per curiam*)).  As for third-party standing, the one remaining "prudential limitation," the Court reserved for another day its consideration of the viability of that designation.  *Id.*  Both Acorn and the County agree this case does not present an issue of third-party standing.  (Def.'s Mot. Dismiss Supp. Mem. 6 n.1; Pl.'s Opp'n 11.)  It is observed here that *Lexmark* was not addressed by either Acorn in its opposition or the County in its reply on the County's motion to dismiss, even though both filings were made subsequent to *Lexmark*'s release.

whether the plaintiff has failed to state a claim for relief.  *Id.* n.4.  Consequently, the Court now

shifts its analysis to whether Acorn has adequately stated a claim for relief under the ADA.

### B. Adequacy of Claims for Relief

#### 1. Americans with Disabilities Act

Although the terminology may have changed, the methodology for determination of

whether a plaintiff may assert a cause of action under a statute is not markedly changed by the

*Lexmark* decision.  There, the Supreme Court noted two relevant, well-established considerations

pertinent to this determination:  Unless Congress states otherwise, (1) a statutory cause of action

is presumed to extend "only to plaintiffs whose interests 'fall within the zone of interests

protected by the law invoked'"; and (2) a statutory cause of action is presumably "limited to

plaintiffs whose injuries are proximately caused by violations of the statute."  134 S. Ct. at 1388,

1390 (citations omitted).  As to the first inquiry, the Court looks to the statute to determine the

interests it protects.

> Congress stated the following broad purposes of the ADA:
>
> (1) to provide a clear and comprehensive national mandate for the elimination of
> discrimination against individuals with disabilities;
> (2) to provide clear, strong, consistent, enforceable standards addressing
> discrimination against individuals with disabilities;
> (3) to ensure that the Federal Government plays a central role in enforcing the
> standards established in this chapter on behalf of individuals with disabilities; and
> (4) to invoke the sweep of congressional authority, including the power to enforce
> the fourteenth amendment and to regulate commerce, in order to address the
> major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101(b).

When those purposes are considered in the context of the ADA's entire statutory scheme,

it may be concluded that the ADA is intended to provide a level playing field for persons with

disabilities—present, past, or perceived—in the three areas subject to the statute:  employment

(Title I), public services (Title II), and public accommodations and services operated by private entities (Title III).  *Id.* §§ 12111-12189.  Local governmental zoning has been recognized as being within the arena of "public services" covered by Title II of the ADA.  *A Helping Hand, LLC v. Baltimore Cnty., Md.*, 515 F.3d 356, 361 & n.2 (4th Cir. 2008) (noting defendant did not contest this point and that other decisions had so held).  Within Title II, the ADA provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Further, Title II specifies that it may be enforced by "any person alleging discrimination on the basis of disability in violation of section 12132 of this title."  *Id.* § 12133.

Although the Fourth Circuit's opinion in *Helping Hand* employed pre-*Lexmark* analytical methodology, it nevertheless squarely addressed the question of whether a plaintiff other than a disabled individual could state a claim for relief under Title II of the ADA.  There, the plaintiff was a methadone treatment clinic contesting the enactment of a county zoning ordinance rendering operation of its clinic at its chosen location unlawful.  515 F.3d at 358.  Because Title II's enforcement provision is so broadly worded—"any person alleging discrimination on the basis of disability," the Court considered Titles I and III of the ADA as well as similar antidiscrimination statutes that address other conduct to decide if the plaintiff clinic fell under the ADA's protection; additionally, the Court looked to regulations issued by the Attorney General for implementation of Title II.  Both Titles I and III expressly protect entities that suffer discrimination "because of the known disability of an individual with whom the . . . entity is known to have a relationship or association."  42 U.S.C. § 12182(b)(1)(E) (Title III); *see also*

§ 12112(b)(4) (Title I).   Moreover, the implementing regulations for Title II explicitly prohibit a local government such as the County from discriminating against "an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."   28 C.F.R. § 35.130(g).   All things considered, *Helping Hand* concluded that Title II permitted a claim of associational discrimination by the plaintiff clinic and, further, that the complaint stated a claim for relief based upon the clinic's association with the addicted persons it served.   515 F.3d at 364.   Transposing the *Lexmark* analysis on the *Helping Hand* case, this Court concludes the interests of the plaintiff clinic there fell within the zone of interests protected by Title II.

In the instant case, Acorn argues it, too, falls within the group of entities and individuals who may assert a claim of associational discrimination under Title II.[3]   It claims to have a "relationship or association" with the potential clients of CC Recovery because, as a landlord, Acorn could be held liable to business invitees, such as the clinic's clients, if they are injured on the premises.   (Pl.'s Opp'n 14.)   Acorn then cites a Maryland case that uses the word "relationship" in describing the basis for a property owner's potential liability to persons entering on the property.   (*Id.*)   Regardless of how the term "relationship" may be used in a Maryland state court case pertaining to premises liability under tort law, the Court finds this rationale unpersuasive in interpreting the same term in the federal ADA.   The mere possibility that Acorn could be held liable for injury on its premises does not equate with a "relationship" with the clinic's clients in the present context.

---

[3]   Acorn, in apparent unawareness of *Lexmark*'s retooled analysis of who may bring a claim under a statute, asserts that "a claim under Title II of the ADA is available to any party with standing under Article III of the Constitution."   (Pl.'s Opp'n 11.)   After *Lexmark*, such a broad claim is no longer sustainable.   There, the Court, facing equally loose statutory language as to who may assert a cause of action for false advertising under the Lanham Act, 15 U.S.C. § 1125(a) ("any person who believes that he or she is or is likely to be damaged by such [wrongful] act"), concluded that the statute's protective reach could not reasonably be interpreted as limited only by Article III standing.   134 S. Ct. at 1388.   Instead, the statute necessarily incorporated both the "zone of interests" test and the proximate-cause test in limiting who may sue under it.   *Id.* at 1391.

In published guidance on the applicable regulation, 28 C.F.R. § 35.130, the Attorney General stated at length,

> Paragraph (g), which prohibits discrimination on the basis of an individual's or entity's known relationship or association with an individual with a disability, is based on sections 102(b)(4) and 302(b)(1)(E) of the ADA. . . . The individuals covered under this paragraph are any individuals who are discriminated against because of their known association with an individual with a disability. For example, it would be a violation of this paragraph for a local government to refuse to allow a theater company to use a school auditorium on the grounds that the company had recently performed for an audience of individuals with HIV disease.
>
> This protection is not limited to those who have a familial relationship with the individual who has a disability. Congress considered, and rejected, amendments that would have limited the scope of this provision to specific associations and relationships. Therefore, if a public entity refuses admission to a person with cerebral palsy and his or her companions, the companions have an independent right of action under the ADA and this section.
>
> During the legislative process, the term "entity" was added to section 302(b)(1)(E) to clarify that the scope of the provision is intended to encompass not only persons who have a known association with a person with a disability, but also entities that provide services to or are otherwise associated with such individuals. This provision was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association with persons with disabilities.

Appendix B to Part 35—Guidance on ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services, originally published July 26, 1991.

This interpretive guidance from the Attorney General suggests that "relationship or association" may be characterized by personal interaction for a not insignificant period of time between a disabled individual and another individual or an entity, in contrast to mere temporal presence on a piece of property.  In the absence of allegations demonstrating Acorn has meaningful interaction with the clinic's potential clients, the Court concludes Acorn does not have the requisite "relationship or association" with them to bring Acorn's interests within the

zone of interests protected by Title II of the ADA. Moreover, the Attorney General's interpretive guidance is consistent with whether Acorn has made the requisite showing for the second relevant consideration under the *Lexmark* analysis, *i.e.*, proximate cause, as to which the Court stated,

> Proximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.
>
> Put differently, the proximate-cause requirement generally bars suits for alleged harm that is "too remote" from the defendant's unlawful conduct. That is ordinarily the case if the harm is purely derivative of "misfortunes visited upon a third person by the defendant's acts."

134 S. Ct. at 1390 (citations omitted).

Although a false-advertising claim under the Lanham Act is assuredly a different context from a claim of disability discrimination under the ADA, the *Lexmark* Court helpfully explained in relation to the former,

> while a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's "inability to meet [its] financial obligations."

*Id.* at 1391 (citation omitted). Thus, the necessary showing of proximate cause under the Lanham Act's prohibition on false advertising "is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff." *Id.*

A similar "one step removed" analysis has been employed in two district court cases in which plaintiffs claimed associational discrimination under Title II of the ADA. These two cases predate *Lexmark* but utilize analyses that effectively rest on the absence of proximate cause, even if not expressly so stated. In the Eastern District of Virginia, the court considered whether a church could claim associational discrimination because it wanted to lease space to a school for

disabled students but was unable to do so after the city denied a special-use permit. *Calvary Christian Center v. City of Fredericksburg*, 800 F. Supp. 2d 760 (E.D. Va. 2011). The court rejected the claim's adequacy in reliance upon the rationale advanced in *Helping Hand*, in which the Fourth Circuit noted, "The [Helping Hand] Clinic . . . has alleged and offered overwhelming (indeed, undisputed) evidence of far more than a 'loose association with disabled patients'; the Clinic's sole raison d'etre is the full-time provision of treatment and services to recovering drug addicts." 515 F.3d at 364. In contrast, the church in *Calvary* had not alleged any unlawful discriminatory effect suffered by the church itself; it only sought to house the school and not to operate it. Thus, "merely housing the day school clearly would not be the 'raison d'etre' of Calvary." 800 F. Supp. 2d at 769. The church's claims amounted only to "'generalized references to association with disabled persons or to advocacy for a group of disabled persons.'" *Id.* (quoting *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 217 (4th Cir. 2002)).

In the second and more recent case, the potential landlord of a methadone clinic asserted a claim of associational discrimination against a municipality when it enacted an emergency moratorium to prevent the clinic from opening in its chosen location. *CRC Health Group, Inc. v. Town of Warren*, Civ. No. DBH-11-196, 2013 WL 607912 (D. Me. Feb. 19, 2013). The court concluded "the landlord ha[d] not pleaded a sufficient relationship with disabled individuals to establish so-called associational discrimination under the ADA." *Id.* at *1. The *CRC Health Group* decision noted the landlord had "alleged plenty of facts to show [its] relationship and association with the clinic itself. But [it has] failed to allege any facts that show a relationship or association with any disabled individual." *Id.* at *2. And, although analyzed under the now-outmoded doctrine of statutory standing, the case noted similarly to *Lexmark* that if persons or entities once removed could sue under Title II of the ADA, then "[t]here might be no end to

the number of entities (for example, service people and suppliers) who could claim a relationship to an entity like a clinic . . . ."  *Id.* at *3 n.4.[4]  This conclusion is consistent with the proximate-cause analysis of *Lexmark*.

Thus, utilizing the *Lexmark* analytical framework, the Court concludes that both *Calvary* and *CRC Health Group* may be interpreted as rejecting asserted claims of associational discrimination because of the absence of proximate cause between the potential landlords' asserted injuries and the conduct of the local governmental entities.  Similarly, here, Acorn fails to satisfy the proximate-cause standard applicable to a claim under Title II.  Because Acorn's asserted interests do not fall within the zone of interests protected by Title II of the ADA, and because Acorn's alleged injuries were not proximately caused by the County's actions, Acorn has failed to state a claim for relief in Count I.  CC Recovery's claim in Count I is unaffected by this ruling.

### 2. *Count III*

The final count of the amended complaint fails to state a claim for relief.  The County says it "is not certain what [Count III] intends to assert or allege."  (Def.'s Mot. Dismiss Supp. Mem. 13.)  Neither is the Court certain as to what Count III intends to allege.  This argument of the County was almost completely ignored by Acorn and *was* completely ignored by CC Recovery, who filed no opposition of any kind.  Acorn's argument in opposition consists of three brief sentences that may be boiled down, with minimal effort, to simply saying, "Yes, it does, too, state a claim."  (Pl.'s Opp'n 19.)

Count III consists of a complaint that the County failed to follow its zoning code pertaining to amendments by (1) "[f]ailing to introduce the Second Proposed Amendment at

---

[4]  Some overlap may exist between the "zone of interests" inquiry and the proximate-cause inquiry, but this Court has followed the *Lexmark* method of analyzing these two points separately.

meeting [*sic*] of the Board of County Commissioners prior to January 3, 2012" and (2) "[i]ntroducing the Second Proposed Amendment for the first time at the January 3, 2012 [*sic*] without listing it as an agenda item and without notice to all County Commissioners as required by law." (Am. Compl. ¶ 100.) The Court is unable to discern from this either a state or federal cause of action. To the extent Count III can be liberally interpreted to state a federal due process claim, the Court notes that such a claim has already been included in Count II, and it would be redundant for the third count to reallege a due process violation.

On the other hand, if Plaintiffs intended to assert a state-law claim, they have unhelpfully failed to elucidate the nature of that claim, even when challenged by the pending motion. In addition, the County has persuasively argued that if Count III is designed to take issue with the denial of a zoning variance—which requires creative interpretation of the actual language of Count III, then Plaintiffs failed to exhaust their judicial remedies as required by Maryland state law. Plaintiffs have not refuted the County's argument. The Court concludes Count III fails to state a claim for relief.

As a final observation, the Court notes that the amended complaint only requests relief specifically be given to CC Recovery. Theorizing that Acorn's request for relief is subsumed in paragraph 6 of the *ad damnum* clause—"[a]ny such additional relief as the interests of justice may require"—the Court does not find the absence of a specific request on Acorn's behalf to be fatal to Acorn's standing to bring this lawsuit, but questions whether Acorn's failure to request specific relief will hamper it in its prosecution of this case.

## V.  *Conclusion*

Acorn has Article III standing to bring this lawsuit against the County. It has failed, however, to state a claim for relief in Count I under the ADA. Count I is properly prosecutable

only by CC Recovery.  Finally, Count III entirely fails to state a claim for relief.  A separate order will issue.

DATED this <u>17th</u> day of June, 2014.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge